**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROGER WATTERS on behalf of L.B.,** | : | **CIVIL ACTION NO. 3:13-CV-770** |
| | : | |
| **Plaintiff,** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY ADMINISTRATION,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

The above-captioned action seeks review of the Commissioner of Social

Security's ("Commissioner") decision denying plaintiff Roger Watters's ("Watters")

claim for supplemental security income on behalf of his minor son, L.B.  Presently

before the court is Watters's appeal from an administrative law judge's ("ALJ")

decision upholding the denial of social security benefits.  (Doc. 1).  For the reasons

that follow, the court will deny the appeal and affirm the ALJ's decision.

**I.     <u>Factual Background and Procedural History</u>**

Watters's son, L.B., was born on October 1, 2000, and he was 10 years old at

the time of the ALJ's decision.[1]  (Doc. 8-2 at 20, 37).[2]  L.B. lives with Watters, who

---

[1] At all times relevant to this matter, L.B. was considered a "school age child."  (Doc. 8-2 at 20); <u>see</u> 20 C.F.R. § 416.926a(g)(2)(iv).

[2] Citations to the administrative record (Doc. 8) reflect the docket number followed by the specific Bates-stamped page number on the bottom right-hand corner of each page of the record.

has primary custody, and his mother has visitation rights on the weekends.  (Id. at 22, 37).

On February 2, 2010, L.B.'s mother protectively[3] filed an initial application for supplemental security income[4] on behalf of L.B. for disability since January 2, 2006.[5]  (Id. at 17).  The Commissioner denied the initial application for social security benefits on September 23, 2010.  (Id.)  Watters subsequently filed a written request for a hearing.  (Id.)  On August 18, 2011, Watters appeared and testified on behalf of L.B. before an ALJ at a hearing held in Harrisburg, Pennsylvania.  (Id.)

Watters alleges that L.B. suffers from the following disabilities: attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), and mood disorder.  (Id. at 20; see Doc. 8-6 at 136).  Prior to moving in with Watters, L.B. lived with his mother, but his behavior deteriorated rapidly in late 2009 when he became increasingly defiant at home and at school.  (Doc. 8-2 at 22, 37-38).  At the

---

[3] A protective filing typically occurs when an individual initially contacts the Social Security Administration to file a claim for benefits and requests an expedited filing date.  Simply stated, it allows an individual to have an application date based upon the date of his or her first contact with the Administration.

[4] Supplemental security income is a federal income supplement program funded by general tax revenues, not social security taxes.  See 42 U.S.C. § 1381.  It is designed to help the aged, blind, or disabled individuals who have little or no income.  See id. § 1381a.

[5] Upon the advice of counsel, Watters amended the alleged disability onset date to February 2, 2010.  For supplemental security income cases under Title XVI of the Social Security Act, the alleged disability onset date is the application date because Title XVI payments are only made beginning in the month after the application date without retroactivity.  20 C.F.R. § 416.335.

hearing, Watters testified that L.B. was acting out at his mother's home by throwing tantrums and becoming angry and aggressive. (Id. at 42). On January 18, 2010, L.B. was voluntarily sent to Philhaven - York Child Day Hospital ("Philhaven"), which is a partial hospitalization program for children with behavioral problems in a normal classroom setting or at home. (Id. at 41-42; Doc. 8-6 at 139). L.B. was discharged from Philhaven on April 1, 2010 into the custody of Watters. (Doc. 8-2 at 23). Since his discharge, L.B. has participated in outpatient therapy approximately once a week with Cathy Snelbaker, L.C.S.W., from T.W. Ponessa & Associates Counseling Services, Inc. (Id. at 23, 39, 43).

At the August 2011 hearing, Watters testified that L.B. had just completed fourth grade. (Id. at 37). Although L.B. began fourth grade in regular classes, Watters stated that L.B. became increasingly defiant of his teachers, cried and pouted, crawled under desks, and banged his head on desks, the floor, or the walls. (Id. at 38). As a result, L.B. was placed in an emotional support classroom, and he continued his therapy sessions with Ms. Snelbaker. (Id. at 38-39). Watters reported that L.B.'s on-going psychotherapy and current medication, Concerta, has helped manage his symptoms. (Id. at 39). Therefore, L.B. would be in regular classes for fifth grade with access to a teacher's aide if he needs to leave the classroom. (Id. at 41).

At home, Watters noted that L.B.'s behavior is "fairly good" when L.B. is on his medication. (Id. at 39-40). L.B. completes his chores, has some friends, and enjoys riding his bicycle, skateboarding, and playing video games. (Id. at 40-41).

L.B. also takes care of himself by bathing and dressing on his own and taking school transportation.  (Id. at 42).  However, Watters stated that L.B. appears depressed after visitations with his mother; he slumps in his seat and does not want to talk or do anything.  (Id. at 44).

On August 26, 2011, the ALJ issued a decision denying L.B.'s claim for supplemental security income.  (See id. at 14-32).  Watters appealed the ALJ's decision to the Appeals Counsel on September 6, 2011, (see id. at 10-13), and the Appeals Counsel denied the appeal on February 1, 2013.  (See id. at 1-6).

On March 26, 2013, Watters, through counsel, filed a complaint in the instant action to appeal the final administrative decision denying his son's application for social security benefits pursuant to 42 U.S.C. §1383(c)(3).[6]  (Doc. 1).  On June 28, 2013, the Commissioner filed an answer (Doc. 7) to Watters's complaint and also provided the administrative record for the court's review.  (Doc. 8).  Upon further briefing by the parties, (Docs. 11, 14, 15), the instant action is ripe for disposition.

_____

[6] "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. §1383(c)(3).  "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business."  Id. § 405(g).  Under the Local Rules for the U.S. District Court for the Middle District of Pennsylvania, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  L.R. 83.40.1.

II.   **Standard of Review**

In reviewing a social security appeal, the court may conduct a plenary review of all legal issues decided by the Commissioner.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  The court's review of findings of fact pursuant to 42 U.S.C. § 405(g), however, is limited to determining whether the findings are supported by "substantial evidence."  42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (stating that courts may not weigh the evidence or substitute its own conclusion for those of the fact-finder); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson,

5

529 F.3d at 200; Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  The Third

Circuit has described substantial evidence as more than a mere scintilla, but

substantial evidence may be less than a preponderance of the evidence.  Brown, 845

F.2d at 1213.  In an adequately developed factual record, substantial evidence may

be "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence." Consolo v. Fed.

Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  "When a conflict in the evidence exists, the ALJ may choose

whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994

F.2d 1058, 1066 (3d Cir. 1993)).  The ALJ must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain

evidence.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000);

Cotter, 642 F.2d at 706-707.  Therefore, the court must scrutinize the record as a

whole on appeal.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.

Califano, 606 F.2d 403, 407 (3d Cir. 1979).

### III.   Sequential Evaluation Process

To receive disability benefits, a plaintiff under the age of 18 must demonstrate that he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).

An ALJ utilizes a three-step sequential evaluation process in assessing a minor plaintiff's claim for supplemental security income.  20 C.F.R. § 416.924.  This process requires the ALJ to consider, in sequence, whether a plaintiff (1) is engaging in "substantial gainful activity,"[7] (2) has an impairment, or combination of impairments, that is "severe,"[8] and (3) has an impairment, or combination of

---

[7] "Substantial gainful activity" is work that "involves doing significant physical or mental activities" and is done "for pay or profit."  20 C.F.R. § 416.972.  If the plaintiff is engaging in substantial gainful activity, the plaintiff is not disabled and the court need not proceed further with the sequential evaluation.  Id. §§ 416.924(a); 416.971.

[8] For a plaintiff under the age of 18, a "severe" impairment is more than a slight abnormality or combination of slight abnormalities that cause more than minimal functional limitations.  20 C.F.R. § 416.924(c).  If the plaintiff does not have any severe impairment, or a combination of impairments which is severe, the plaintiff is not disabled and the sequential evaluation ends at this step.  Id. § 416.924(a).  Regardless of the ALJ's conclusion, all medically determinable impairments, whether severe or non-severe, are considered in the last step of the sequential evaluation process.  Id. §§ 416.923, 416.924a(b)(4).

impairments, that meets, medically equals, or functionally equals the requirements of a "listed impairment."[9]  Id. § 416.924(a).

To determine whether an impairment functionally equals a listed impairment, the ALJ considers how the plaintiff functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being.  Id. § 416.926a(b)(1).  An impairment functionally equals a listed impairment when the plaintiff has "marked" limitations in two of the six domains or an "extreme" limitation in one domain.  Id. § 416.926a(d).

When the ALJ considers whether the plaintiff has marked or extreme limitations in any domain, the ALJ examines the evidence in the record on how the plaintiff's impairments limit his or her functioning and "compare[s] [the plaintiff's] functioning to the typical functioning of children [his or her] age who do not have impairments."  Id. § 416.926a(f)(1).  A "marked" limitation means "a limitation that is more than moderate but less than extreme" and "seriously" interferes with the plaintiff's ability to independently initiate, sustain, or complete activities.  Id.

---

[9] A "listed impairment" is one that appears on the Commissioner's Listing of Impairments, which is "a list of impairments presumed severe enough to preclude any gainful work."  Sullivan v. Zebley, 493 U.S. 521, 525 (1990); see 20 C.F.R. pt. 404, subpt. P, app. 1.  If the plaintiff has an impairment, or combination of impairments, that meets or medically or functionally equals a listed impairment, and it has lasted or is expected to last for a continuous period of at least 12 months, the plaintiff is disabled.  20 C.F.R. § 416.924(d).  Otherwise, the plaintiff is not disabled under the Social Security Act.  Id.

§ 416.926a(e)(2)(I) (internal quotations omitted).  An "extreme" limitation is "more than marked" and "very seriously" interferes with the plaintiff's ability to independently initiate, sustain, or complete activities.  Id. § 416.926a(e)(3)(I).

In the case *sub judice*, the ALJ applied the sequential evaluation process and, at step one, concluded that L.B. has not engaged in substantial gainful activity since the application date for disability benefits.  (Doc. 8-2 at 20).  At step two, the ALJ found that L.B. has the following severe impairments: ADHD,[10] ODD, and mood disorder.  (Id.)  At step three, the ALJ held that L.B.'s impairments do not meet or medically equal listing 112.11 for ADHD or listing 112.04 for mood disorders.  (Id. at 20-21).  The ALJ also found that L.B.'s impairments do not functionally equal any listed impairment.  (Id. at 21).  Specifically, the ALJ determined that L.B. has less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others as well as no limitations in moving about and manipulating objects, caring for himself, and health and physical well-being.  (Id. at 21-29).  As a result of the three-step sequential evaluation process, the ALJ concluded that L.B. has not been disabled since February 2, 2010 under the Social Security Act.  (Id. at 29).

---

[10] In his factual findings, the ALJ states that L.B. has severe Attention Deficit Disorder ("ADD"), but the remainder of the ALJ's decision refers to L.B.'s impairment as ADHD.  (See Doc. 8-2 at 20).  Under the circumstances, the court construes the ALJ's finding to be that L.B. suffers from severe ADHD.

**IV.**   <u>**Discussion**</u>

In the instant action, Watters requests that the court reverse or remand his son's disability claim to the ALJ for further proceedings for three reasons. First, substantial evidence does not support the ALJ's administrative decision because the ALJ failed to address contrary evidence, including GAF scores, school records, and a diagnosis for generalized anxiety disorder. (Doc. 11 at 9-13). Second, the ALJ did not accurately characterize the evidence upon which he relied in his decision, such as L.B.'s progress at Philhaven, his behavior and needs in the classroom, and his failure to attend appointments. (<u>Id.</u> at 13-15). Third, the ALJ improperly rejected the medical opinions of Herbert Golub, Ph.D., a non-examining medical expert, regarding L.B.'s functional limitations. (<u>Id.</u> at 15-18). The court will address each argument *seriatim.*

**A.**   **Failure to Address Contrary Evidence**

In his administrative decision, the ALJ concluded that L.B.'s impairments do not meet, medically equal, or functionally equal any listed impairments and therefore L.B. is not disabled under the Social Security Act. (Doc. 8-2 at 20-21). In so finding, the ALJ explicitly relied on evidence from medical sources as well as information from other sources, including L.B.'s teachers, parents, and school records. (<u>Id.</u> at 22). The court notes that the administrative record in this case is 337 pages in length, primarily consisting of medical records. (<u>See</u> Doc. 8). The ALJ did an adequate job of reviewing L.B.'s medical history and personal background in his decision.

In assessing L.B.'s functioning, the ALJ first noted that L.B.'s mother did not complete a function report delineating L.B.'s limitations in the initial application. (Doc. 8-2 at 22).  The ALJ also observed that, while living with his mother, L.B. experienced traumatic events, but has shown marked improvement since Watters was granted primary custody in April 2010.  (Id.)  At the hearing, Watters testified on behalf of L.B. that L.B. has difficulties with social interactions and depression, and that L.B. frequently becomes frustrated or angry when he wants to be the leader or does not feel accepted by others.  (Id. at 22-23).  However, Watters worked closely with L.B.'s medical sources and found that L.B.'s medication and weekly therapy sessions have improved L.B.'s behavior.  (Id. at 20-21).

With respect to the medical evidence, the ALJ began with the records of John Mesaros, M.D., from Philhaven where L.B. was placed from January 18, 2010 until April 1, 2010.  (Id. at 23).  The ALJ found that, although L.B. was "frequently defiant during his treatment, he made some notable progress."  (Id.)  Upon discharge, L.B. was compliant in taking his medication and participated in outpatient therapy with Ms. Snelbaker for counseling and medication management. (Id.)  The ALJ closely scrutinized the medical records from Ms. Snelbaker as L.B.'s treating medical source.  (See id.)  The ALJ found that Ms. Snelbaker's treatment notes did not support her functional capacity assessment of marked limitations in five out of six functional domains and moderate limitations in moving about and manipulating objects.  (Id.)  In particular, Ms. Snelbaker assessed consistently high

GAF[11] scores, including over 60, which is indicative of only mild to moderate limitations.  (Id.)  Therefore, the ALJ discounted Ms. Snelbaker's functional capacity assessment.  (See id.)

Next, the ALJ rejected the opinions of non-examining medical expert, Dr. Golub, who assessed L.B. as having marked limitations in attending and completing tasks and interacting and relating with others.  (Id. at 23, 48-49).  The ALJ clearly explained that Dr. Golub did not articulate his reasoning, and that the record evidence does not support Dr. Golub's opinion that L.B.'s impairments functionally equal a listed impairment.  (Id. at 23).

The ALJ further determined that L.B. has few limitations in the school setting because he does not attend classes in an emotional support classroom, require special assistance, or have an individualized education plan.  (Id.) Moreover, L.B. has strong grades, good attendance, and no disciplinary record as of April 2010.  (Id. at 23-24).  A teacher's evaluation from September 2010

---

[11] The GAF score allows a medical source to indicate his judgment of a plaintiff's overall psychological, social, and occupational functioning in order to assess the plaintiff's mental impairments. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 3-32 (4th ed. 1994).  A GAF score is set within a particular range if either the severity of symptoms or the level of functioning falls with that range. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  Id.  A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 represents some mild symptoms or difficulty in social, occupational, or school functioning, but generally functioning well with some meaningful interpersonal relationships.  Id.

indicates that L.B. has shown "dramatic improvement after receiving medication management." (Id. at 24).

Finally, the ALJ noted that L.B. failed to appear at a consultative examination with John Tardibuono, D.Ed., on September 1, 2010 and missed several appointments at T.W. Ponessa. (Id.) The ALJ discounted the credibility of L.B.'s parents, reasoning that, if L.B. was severely impaired, his parents would have made a greater effort to attend scheduled sessions. (Id.) For all of these reasons, the ALJ found that L.B. is not disabled under the Social Security Act.

Watters asserts that the ALJ's decision was not based on substantial evidence for three main reasons. First, the ALJ failed to acknowledge the lower GAF scores of examining source, Jeffrey Hermann, M.D., and Dr. Mesaros at Philhaven. (Doc. 11 at 9-10). Second, the ALJ did not consider certain contrary evidence from L.B.'s school records. (Id. at 10-11). Third, the ALJ did not explain why he rejected Dr. Mesaros's generalized anxiety disorder diagnosis. (Id. at 11-12).

It is well-established that an ALJ must consider all relevant evidence in the record. Burnett, 220 F.3d at 121. Although the ALJ may weigh the credibility of evidence, he or she must give some indication of the evidence which he or she rejects and the reasons for discounting such evidence. Id. at 121-22; Cotter, 642 F.2d at 704-05 (holding that an ALJ's administrative decision must "be accompanied by a clear and satisfactory explication of the basis on which it rests."). Courts have since clarified that an ALJ is not required to use any particular language or adhere to a particular format in conducting his analysis. See Jones v.

13

Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Rather, an ALJ is merely required "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Id.  Thus, if the ALJ's decision as a whole demonstrates substantial evidence to support the ALJ's conclusion, then the ALJ adequately satisfies the Burnett standard.  Id. at 504-05.

Accordingly, "[t]here is no requirement that the ALJ discuss in [his or her] opinion every tidbit of evidence included in the record."  Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004); Fargnoli, 247 F.3d at 42.  In particular, an ALJ is not required to address every statement in the record when "[o]verwhelming evidence in the record discounted its probative value, rendering it irrelevant."  Johnson, 529 F.3d at 204.  The ALJ must only articulate "at some minimal level [his or] her analysis of a particular line of evidence."  Phillips v. Barnhart, 91 F. App'x 775, 780 n.7 (3d Cir. 2004).  "Moreover, the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."  Id.

In the instant case, there is no indication that the ALJ failed to consider the additional evidence.  Rather, when viewed as a whole, the ALJ properly reviewed the entire record and discussed all the relevant medical and non-medical evidence.

### i.    *GAF Scores*

The medical records demonstrate that Dr. Mesaros assessed a GAF score of 46 when L.B. entered Philhaven and raised the score to 49 upon L.B.'s discharge in April 2010.  (See Doc. 11 at 9; Doc. 8-7 at 243-46).  In February 2011, after continued behavioral problems in school, Dr. Hermann also examined L.B. and assessed a

14

GAF score of 50.  (See Doc. 11 at 9; Doc. 8-8 at 291-94).  Dr. Hermann recommended that L.B. attend classes in an emotional support classroom and continue his therapy sessions.  (Doc. 8-8 at 291-94).

In assessing Dr. Mesaros's records regarding L.B.'s treatment at Philhaven, the ALJ observed that L.B. was "frequently defiant during his treatment."  (Doc. 8-2 at 23).  Nevertheless, the ALJ determined that L.B. "made some notable progress" due to compliance with his medication and psychotherapy.  (Id.)  The ALJ then focused on L.B.'s progress in his outpatient therapy sessions with Ms. Snelbaker as L.B.'s treating medical source.  (Id.)  The ALJ concluded that L.B.'s "consistently high Global Assessment of Functioning Scores, frequently in excess of 60," do not support a finding of more than minor limitations.  (Id.)  In arriving at this conclusion, the ALJ did not rely solely on Ms. Snelbaker's GAF scores; he also cited to Dr. Hermann's report including a GAF score of 50.  (Id. (citing Ex. 12F, Doc. 8-8 at 291-94)).  Therefore, the court finds that the ALJ adequately considered all relevant GAF scores and merely gave greater weight to the higher GAF assessments.

### ii. *School Records*

Watters next argues that the ALJ failed to consider evidence of two other disciplinary reports, a teacher's questionnaire for Dr. Shapiro from January 2011, and L.B.'s participation in a Self-Esteem Group with the school counselor.  (Doc. 11 at 10-11).  The court disagrees.  In the analysis of L.B.'s limitations in the school setting, the ALJ noted several times that L.B. struggled with his behavior, but

L.B.'s most recent evaluations indicate that his behavior was improving with medication. (See Doc. 8-2 at 20-21, 24-26). For example, the ALJ cited several school records, including a letter from the school counselor, in which she stated that L.B. previously participated in a Self-Esteem Group to "work on positive self-esteem." (Id. at 24-27 (citing Ex. 2F, Doc. 8-7 at 207-28)). However, the ALJ gave greater weight to other teacher evaluations showing that L.B. made "dramatic improvement since starting on medication." (Id. at 26; see also id. at 20-21, 24-26).

The ALJ also relied in part on a disciplinary report from April 19, 2010, in which the Red Lion Area School District confirmed that L.B. did not have a disciplinary record when he lived with his mother. (Id. at 24). The ALJ did not explicitly consider a December 2009 form indicating that L.B. once lost ten minutes of recess for being disrespectful or a report from August 24, 2010 stating that L.B. currently has a disciplinary record in the Dover Area School District. (Doc. 11 at 10-11). However, the ALJ's reliance on the April 2010 report was justified because the single incident from December 2009 was minor and occurred before the relevant time period for disability benefits. (See Doc. 8-7 at 213). Moreover, the more recent report from August 2010 contains no details regarding L.B.'s disciplinary record to support a finding of disability. (See id. at 228).

The medical records of Dr. Shapiro at Wellspan Behavioral Health also indicate that L.B. has been stable on Concerta and was given a GAF score of 60 in December 2010. (Doc. 8-8 at 285-88). Although Dr. Shapiro later received a January 2011 questionnaire revealing that L.B. continued to exhibit several problematic

behaviors, Dr. Shapiro did not alter his medical opinions.  In the context of all of
these factors, the ALJ's decision properly relied on Dr. Shapiro's opinions.  (See
Doc. 8-2 at 22-23 (citing Ex. 10F, Doc. 8-8 at 285-88)).

### iii.    *Generalized Anxiety Disorder Diagnosis*

Finally, Watters asserts that the ALJ failed to consider or explain why he
rejected Dr. Mesaros's diagnosis of generalized anxiety disorder.  (Doc. 11 at 11-12).
In evaluating a disability claim, an ALJ must consider all impairments in the
record.  20 C.F.R. § 416.924(a).  The court first notes that Watters did not raise
generalized anxiety disorder as an impairment in the initial application or at the
hearing before the ALJ.  (Doc. 8-2 at 20; see Doc. 8-6 at 136).  More importantly,
Watters's argument incorrectly focuses on the diagnosis of generalized anxiety
disorder rather than the functional limitations caused by the impairment.  A
diagnosis in and of itself does not demonstrate entitlement to disability benefits
under the Social Security Act.  A plaintiff must also show that the impairment
resulted in disabling limitations.  Phillips, 91 F. App'x at 780 (citing Petition of
Sullivan, 904 F.2d 826, 845 (3d Cir. 1990)).  Notably, Watters does not specify how his
son's generalized anxiety disorder further impaired his functioning in any relevant
domain.  See Rutherford, 399 F.3d at 552-53 (declining to remand because ALJ's
failure to consider obesity would not affect the outcome of the case when plaintiff
did not demonstrate any limitations from the impairment).  Therefore, Watters fails
to satisfy his burden of proof at steps two and three of the sequential disability
evaluation process to establish disability based on generalized anxiety disorder.

17

In this case, the ALJ adopted the diagnoses suggested by other treating, examining, and consultative medical sources, including Dr. Shapiro, Dr. Hermann, and Dr. Golub, all of whom were aware of Dr. Mesaros's diagnosis of generalized anxiety disorder.  (Doc. 8-2 at 20 (citing id. at 49; Doc. 8-8 at 285-88, 291-94)).  Thus, the ALJ indirectly considered a potential generalized anxiety disorder impairment in his administrative decision.  See Rutherford, 399 F.3d at 553.  Upon review of the record, the court finds that the ALJ did not ignore the contrary evidence Watters raises in the instant action.

**B.     Mischaracterization of Evidence**

Watters next argues that the ALJ incorrectly characterized evidence in support of his administrative decision.  (Doc. 11 at 13-15).  Specifically, Watters contests the following findings: (1) that L.B. made "notable progress" at Philhaven; (2) that L.B. did not require an emotional support classroom or special assistance in school; (3) that L.B.'s teacher noted "dramatic improvement" in L.B.'s behavior with medication management; and (4) that L.B.'s impairments were not as severe as alleged because he failed to attend several therapy appointments.  (Id. at 13-14).  In evaluating the ALJ's findings, the court remains mindful that it is not the court's place to weigh the evidence.   The court may determine only whether the ALJ's decision was based on substantial evidence.  See 42 U.S.C. § 405(g); see also Johnson, 529 F.3d at 200; Rutherford, 399 F.3d at 554 (stating that courts may not weigh the evidence or substitute its own factual findings in the ALJ's decision).

Based on this standard of review, the court concludes that substantial evidence

exists to support the ALJ's findings in this case.

First, Watters asserts that L.B.'s discharge report from Philhaven contradicts

the ALJ's finding of notable progress because the discharge report indicates that

L.B. "struggled with behaviors and made few gains." (Id. at 13; see Doc. 8-7 at 243-

46).  In discussing the medical records from Philhaven, the ALJ explicitly noted that

L.B. was "frequently defiant during his treatment," but the ALJ concluded that

L.B. still made "some notable progress." (Doc. 8-2 at 23).  Specifically, L.B. did not

demonstrate harm to himself or others, he was compliant in taking his medication,

and he continued outpatient therapy for counseling and medication management.

(Id.)  Thus, there is substantial evidence to support the ALJ's finding of "some

notable progress" at Philhaven.

Second, the ALJ found that L.B. did not require an emotional support

classroom or special assistance in school.  (Id.)  In response, Watters points to

medical evidence and Watters's testimony showing that, upon Dr. Hermann's

recommendation, L.B. was placed in an emotional support classroom for the second

half of fourth grade.  (Doc. 11 at 13; see Doc. 8-2 at 38-39; Doc. 8-8 at 294).  Prior to

fourth grade, L.B. also participated in a Self-Esteem Group with the school

counselor once a week for thirty minutes.  (Doc. 11 at 13; see Doc. 8-7 at 214).  The

court notes, however, that Watters also testified that L.B. would be in a standard

classroom setting in fifth grade with access to a teacher's aide if necessary.  (Doc. 8-

2 at 41).  Therefore, the ALJ properly found that L.B. no longer required an emotional support classroom or special assistance.

Third, Watters contends that a September 2010 teacher evaluation showing improvements from "very much" to "pretty much" for four problematic behaviors was not a "dramatic improvement."  (Doc. 11 at 14; see Doc. 8-7 at 207).  In his administrative decision, however, the ALJ clearly relied on other teacher evaluations which indicate that L.B.'s medication was causing a "huge positive change in attention, attitude, and effort."  (Doc. 8-2 at 20-21, 24-26; see Doc. 8-7 at 216).  In February 2011, Dr. Hermann also noted a teacher's report that L.B.'s behavior had improved since she began working with him and he increased his dosage of Concerta to mitigate ADHD symptoms.  (See Doc. 8-8 at 292).  Likewise, Watters testified on behalf of L.B. that the medication has helped control L.B.'s behavior.  (Doc. 8-2 at 39).  Based on such substantial evidence, the ALJ's finding of "dramatic improvement" as a result of medication management was appropriate.

Finally, Watters argues that no medical evidence supports the ALJ's finding that L.B.'s impairments are not as severe as alleged for failure to attend therapy appointments.  (Doc. 11 at 14-15).  Contrary to Watters's assertion, a medical opinion is not necessary to support the ALJ's finding in this case.  Pursuant to the social security regulations, an ALJ has discretion to uphold the Commissioner's denial of social security benefits as a sanction for a plaintiff's refusal to submit to a consultative examination.  20 C.F.R. § 416.918; see Walker v. Barnhart, 172 F. App'x 423, 427-28, n.2 (3d Cir. 2006); Pearce v. Sullivan, 871 F.2d 61, 63-64 (7th Cir. 1989)

(noting that a plaintiff who does not appear for his appointment or who attends but fails or refuses to take part in the examination may be denied benefits as a sanction for his disobedience).

In the instant action, the ALJ expressly noted that L.B. was scheduled to attend a consultative examination with Dr. Tardibuono on September 1, 2010. (Doc. 8-2 at 24).  Despite receiving confirmation from L.B.'s mother on August 27, L.B. did not appear for the examination.  (Id.)  Rather than denying benefits as a sanction, the ALJ merely considered the failure to attend the consultative examination as well as therapy sessions with T.W. Ponessa in relation to the credibility of L.B.'s parents regarding his symptoms.  See Rivera v. Harris, 623 F.2d 212, 216 n.5 (2d Cir. 1980) (stating that 20 C.F.R. § 416.918 provides, in effect, that a plaintiff, who has a disabling impairment amenable to prescribed treatment which could be expected to restore his or her ability to work, cannot be "disabled" if he "willfully fails" to follow such prescribed treatment).

The court notes that an ALJ may evaluate the plaintiff's credibility regarding his or her symptoms.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  In assessing credibility regarding symptoms, the ALJ should "determine the extent to which a [plaintiff] is accurately stating the degree of pain and the extent to which he or she is disabled by it."  Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)).  In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage,

effectiveness, and side effects of any medication taken to alleviate the symptoms; (5)

treatment, other than medication, for relief of the symptoms; (6) any measures the

plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work

record; and (8) the plaintiff's demeanor during the hearing.  See 20 C.F.R. §

404.1529(c)(3).  The ALJ "has the right, as the fact finder, to reject partially, or even

entirely, such subjective complaints if they are not fully credible."  Baerga v.

Richardson, 500 F.2d 309, 312 (3d Cir. 1974).  The ALJ may reject the plaintiff's

statements regarding his or her symptoms "if [the ALJ] affirmatively addresses the

claim in his decision, specifies the reason for rejecting it, and has support for his

conclusion in the record."  Hirschfeld v. Apfel, 159 F. Supp. 2d 802, 811 (E.D. Pa.

2001); see also Fargnoli, 247 F.3d at 43.

The ALJ properly evaluated the credibility of L.B.'s parents in this case by

taking into account L.B.'s psychotherapy treatment.  (Doc. 8-2 at 24).  The ALJ

concluded that L.B.'s symptoms were not as severe as his parents allege because

L.B. did not consistently attend therapy sessions to relieve his symptoms.  (Id.)  The

court finds that the ALJ acted within his discretion in discounting the credibility of

L.B.'s parents.

### C.    Weight of Non-Examining Medical Expert's Opinion

Lastly, Watters argues that the ALJ improperly rejected the medical opinions

of Dr. Golub, who testified at the hearing as a non-examining medical expert.  (Doc.

11 at 15-18).  The social security regulations require an ALJ to evaluate every

medical opinion received.  20 C.F.R. § 416.927(c).  To determine the weight of a

medical opinion, an ALJ must first assess whether the opinion is from a treating,

non-treating examining, or non-examining source.  See id.  The Third Circuit Court

of Appeals has set forth the standard for evaluating the opinion of a treating

medical source in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000).  The Third Circuit

stated, in relevant part, as follows:

> A cardinal principle guiding disability eligibility determinations is that
> the ALJ accord treating physicians' reports great weight, especially
> "when their opinions reflect expert judgment based on a continuing
> observation of the patient's condition over a prolonged period of time" .
> . . . [T]he ALJ must consider the medical findings that support a treating
> physician's opinion that the claimant is disabled.  In choosing to reject
> the treating physician's assessment, an ALJ may not make "speculative
> inferences from medical reports" and may reject "a treating physician's
> opinion outright only on the basis of contradictory medical evidence" and
> not due to his or her own credibility judgments, speculation or lay
> opinion.

Id. at 317-18 (internal citations omitted).  The social security regulations further

state that an ALJ should give more weight to the opinions of an examining medical

source than those of a non-examining source.  20 C.F.R. § 416.927(c)(1).  However,

an ALJ is not required to give special treatment to the opinions of either a non-

treating examining source or a non-examining source.  Id. § 416.927(c), (e).  An ALJ

also need not defer to a medical source's opinion about the ultimate issue of

disability because that determination is an administrative finding reserved to the

Commissioner.  Id. § 416.927(d).

In the instant action, the ALJ concluded that L.B.'s impairments do not

functionally equal any listed impairment because L.B. only has less than marked or

no limitations in the relevant functional domains.  (Doc. 8-2 at 24-29).  At the hearing, however, Dr. Golub opined that L.B. suffers from marked limitations in interacting and relating with others, and attempting and completing tasks.  (Id. at 48-49).  When L.B. is not on medication, he has extreme limitations in attempting and completing tasks.  (Id. at 48).  In the other four domains, Dr. Golub determined that L.B.'s functional limitations are not at listing level.  (Id. at 49).

In evaluating Dr. Golub's opinions, the ALJ expressly stated that "his testimony was not convincing" because "the records contained within the file do not support a finding of disability."  (Id. at 23).  Moreover, Dr. Golub "could not clearly articulate his reasons for meeting the listing" and "did not know which listing would be met."  (Id.)  As a result, the ALJ assigned no weight to Dr. Golub's opinions regarding L.B.'s functional limitations.  (Id.)

Watters contends that Dr. Golub identified listing 112.04 as the appropriate listing in this case as well as two specific functional domains in which L.B. has marked limitations.  (Doc. 11 at 16).  The court agrees.  However, an ALJ evaluates the opinions of a non-examining consultant based on supporting evidence in the record and supporting explanations from the consultant.  20 C.F.R. § 416.927(e).  Here, Dr. Golub does not list any relevant facts or cite to any evidence in the record in support of his opinions regarding L.B.'s functional limitations.  Rather, Dr. Golub simply offers that there is conflicting evidence in the record.  (Doc. 8-2 at 45).  Dr. Golub notes that Dr. Mesaros indicated that Philhaven was not successful in altering L.B.'s behavior.  (Id. at 47).  Yet, shortly after his discharge from Philhaven,

24

Ms. Snelbaker assigned L.B. a GAF score of 65 for mild symptoms. (Id. at 47-48).

Ms. Snelbaker also completed a contradictory functional capacity assessment, in

which she opined that L.B. has marked limitations in five of six functional domains

and moderate limitations in moving about and manipulating objects. (Id. at 48).

The only basis for Dr. Golub's opinions in the record is that L.B. seemed to

deteriorate around February 2010 due to problematic living arrangements with his

mother. (Id. at 46-47). The ALJ properly determined that the record evidence does

not support Dr. Golub's conclusory opinions regarding L.B.'s functional limitations;

accordingly, the ALJ accorded Dr. Golub's opinions no weight consonant with

social security regulations.

On appeal, Watters mentions other items of evidence as support for Dr.

Golub's opinions. (Doc. 11 at 16-17). The court reiterates that the standard of

review is not whether the evidence of record supports Dr. Golub's opinion that L.B.

has marked limitations in two functional domains, but whether substantial

evidence supports the ALJ's contrary finding. Allen v. Bowen, 881 F.2d 37, 39 (3d

Cir. 1989). The court finds that the ALJ adequately evaluated all of the medical

opinions in the record and, as previously detailed, his findings regarding L.B.'s

functional limitations are supported by substantial evidence. Such evidence

includes the medical records from various treating and examining sources, as well

as evidence from L.B.'s teachers and Watters's testimony. Thus, the ALJ did not

substitute his own lay opinion for Dr. Golub's opinions; rather, the ALJ properly

weighed all the evidence of record and exercised his power to render the final determination regarding disability.

## V.      Conclusion

The court's review of the administrative record as a whole reveals that substantial evidence supports the ALJ's decision in this case.  Therefore, the court will deny Watters's appeal on behalf of L.B. and affirm the ALJ's administrative decision upholding the Commissioner's denial of social security benefits.

An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      March 26, 2014